# United States District Court

## SOUTHERN DISTRICT OF INDIANA

**UNITED STATES OF AMERICA**

**V.**

**CRISTIAN DELORES-GUTIERREZ**

**JUDITH SONOQUI-ALVAREZ**

## CRIMINAL COMPLAINT

CASE NUMBER: 1:17-mj-0087

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

On or about February 8, 2017, in Marion County, in the Southern District of Indiana, the defendants, Cristian Delores-Gutierrez and Judith Sonoqui-Alvarez did commit the offense of possession with the intent to distribute one (1) kilogram or more of a mixture of substance containing a detectable amount of heroin, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A).

I further state that I am a Special Agent, and that this complaint is based on the facts contained in the attached Affidavit.

**Continued on the attached sheet and made a part hereof.**

Daron Babcock, Special Agent, HSI

**Sworn to before me, and subscribed in my presence**

2/14/17 at Indianapolis, Indiana

**Date**

Debra McVicker Lynch, U.S. Magistrate Judge

**Name and Title of Judicial Officer**

**Signature of Judicial Officer**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Daron Babcock, being duly sworn, depose and say:

**Affiant Background and Affidavit Purpose**

1. I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code – that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. I have been employed by the United States Immigration and Customs Enforcement ("ICE"), and its predecessor, the United States Customs Service, since June 2001. I am currently assigned as a Special Agent with the ICE Homeland Security Investigations ("HSI") office in Indianapolis, Indiana, and have been so assigned since July 2007. In connection with my official duties, I investigate criminal violations of the federal narcotics laws, including, but not limited to, Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963. I also investigate violations of the federal money laundering and bulk cash smuggling laws, including, but not limited to, Title 18, United States Code, Sections 1956 and 1957, and Title 31, Section 5332. In addition, I also investigate violations of federal firearms laws, including, but not limited to, Title 18, United States Code, Sections 922 and 924, as well as administrative and criminal immigration laws. I have received special training in the enforcement of laws concerning controlled substances as found in Title 21 of the United States Code. I also have been involved in various types of electronic surveillance and in the debriefing of defendants, witnesses, and informants, as well as others, who have knowledge both of the distribution and transportation of

controlled substances and also of the laundering and concealing of proceeds from drug trafficking offenses.

3. I have received training in investigations involving individuals smuggling, transporting and distributing illegal narcotics. I am familiar with the ways in which drug traffickers conduct their business, including, but not limited to, their methods of importing and distributing controlled substances, their utilization of stash houses and other storage facilities, their use of firearms in the commission of drug trafficking offenses and as means to protect drug and bulk currency storage locations, their use of mobile phones and social network applications, and their use of numerical codes and code words to conduct their transactions.

4. I have also received training in money-laundering and bulk-cash-smuggling techniques utilized by drug trafficking organizations (DTOs) to launder, conceal, and transport illicit financial proceeds related to controlled substances crimes throughout the United States and across international borders. I am familiar with the ways in which DTOs transport their proceeds, including, but not limited to, their methods of collecting and transporting bulk currency, their use of passenger and commercial vehicles for concealment, their use of currency "mules" and handlers to avoid law enforcement detection, their use of stash houses and other storage facilities, and their use of simple or sophisticated vehicular compartments and cross-border smuggling techniques.

5. I am familiar with and have participated in all of the normal methods of investigation, including, but not limited to, visual surveillance, questioning of witnesses, use of informants, use of pen registers, the authorized interception of communications, the execution of search warrants, and undercover operations.

6. My experience as a controlled substances investigator, my participation in the investigation of DTOs, my conversations with other federal and state investigators familiar with drug-trafficking and money-laundering matters, and my training comprise the backdrop for the following conclusions and opinions based on the facts set forth below. As this affidavit is being submitted for the limited purpose of applying for arrest warrants as set forth below, I have not included each and every fact known to me concerning this investigation.

7. This Affidavit is submitted in support of a Criminal Complaint charging Cristian DELORES-GUTIERREZ (Hispanic male with date of birth XX/XX/1985) and Judith SONOQUI-ALVAREZ (Hispanic female with date of birth XX/XX/1983) with the offense of Possessing with the Intent to Distribute One (1) Kilogram or More of Heroin, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A).

**Offense and Investigation**

8. On February 8, 2017, at approximately 10:48 a.m., Indiana State Police (ISP) Trooper Bradley Smith was observing eastbound traffic along Interstate 70 near mile marker 93 in Marion County, Indiana, a location within the Southern District of Indiana. Trooper Smith was in full ISP uniform and was positioned in the median between the westbound and eastbound lanes of traffic in an unmarked ISP vehicle equipped with emergency lights and sirens.

9. Trooper Smith observed a gray Dodge Ram pickup truck bearing Arizona license plate BPC8416 approaching his position in the median along I-70. Based on Trooper Smith's training and experience, the Dodge Ram visibly appeared to be moving in excess of the posted speed limit in the far right lane of travel while passing cars; the Ram significantly reduced its speed as it approached Trooper Smith's location. Trooper Smith noted that the pickup truck had

dark window tinting, to include the attached camper shell. The Dodge Ram made an erratic lane change from the right lane to the center lane shortly after it passed Trooper Smith's location, and he observed that the Ram's turn signal was activated only after it was halfway into the center lane of travel.

10. Trooper Smith conducted a traffic stop of the Dodge Ram based on the observed moving violation (failure to signal) and spoke with the driver who identified himself, via an Arizona driver's license, as Cristian Raul Delores. He was later more fully identified by law enforcement as Cristian DELORES-GUTIERREZ. The front seat passenger was identified later via an Arizona driver's license as Judith SONOQUI-ALVAREZ. Trooper Smith asked DELORES-GUTTIEREZ to step to the rear of the Dodge Ram so they could speak, and DELORES-GUTIERREZ complied with the request.

11. DELORES-GUTIERREZ provided Trooper Smith with Arizona vehicle registration and insurance information confirming he was the actual owner of the Dodge Ram. DELORES-GUTIERREZ stated that he and his wife (SONOQUI-ALVAREZ) were headed to Ohio because he used to work there and was going back to stay for about a year to do electrical work. Trooper Smith believed that DELORES-GUTIERREZ was being evasive as he answered questions because he seemed unsure about his responses.

12. Trooper Smith then approached SONOQUI-ALVAREZ and observed that she was exhibiting labored breathing, that she was clutching her chest, and that her hands were shaking uncontrollably. As Trooper Smith explained to your Affiant, he recognized these signs as similar to those prior drug traffickers whom he contacted exhibited during highway traffic enforcement actions along I-70. SONOQUI-ALVAREZ advised Trooper Smith that she and her husband were going to Ohio for a week to sell a house and were then heading back to Arizona.

13. Trooper Smith then contacted DELORES-GUTIERREZ again and confirmed with him that he and his wife were going to stay in Ohio for a year. After receiving confirmation from DELORES-GUTIERREZ that he and SONOQUI-ALVAREZ were going to remain in Ohio for a year, Trooper Smith suspected that they were engaged in criminal activity based on what he observed during the course of the traffic stop. Trooper Smith noted the entire rear bed of the Dodge Ram, which was covered with a camper shell but had windows through which the trooper could see, was completely empty. There were also few items inside the cab of the vehicle, which would be inconsistent with a year-long trip to Ohio.

14. Trooper Smith returned to his ISP vehicle to conduct records checks on the occupants of the Dodge Ram. He also requested canine officer assistance from ISP Trooper Adam Buchta and Indianapolis Metropolitan Police Department (IMPD) Officer Miguel Roa, who had been positioned in the same median where he had originally positioned just prior to the traffic stop. While Trooper Smith was conducting his checks, the canine units responded within approximately one minute. During his checks, Trooper Smith requested Officer Roa walk his drug-detection certified canine Panda around the Dodge Ram. Officer Roa walked Panda around the exterior of the Dodge Ram, and he advised Trooper Smith that Panda gave a positive indication to the odor of controlled substances on the truck.

15. Trooper Smith, Officer Roa, and Trooper Buchta then began to conduct a search of the Dodge Ram based on Panda's alert for the odor of controlled substances. Trooper Smith located two bundles, which he recognized to most likely be controlled substances, in the bottom center console between the front seats of the Dodge Ram. The packages had "Santisma" written on them, which Officer Roa (a Spanish-speaking individual) indicated translated to "holy" or "saintly" in English. Trooper Smith also located a card depicting "Santa Muerte" underneath the

two bundles of suspected narcotics. Based on Trooper Smith's training and experience, "Santa Muerte" is believed by many narco-traffickers with ties to Mexican-based DTOs to protect illegal shipments of controlled substances from law enforcement detection.

16. Both DELORES-GUTIERREZ and SONOQUI-ALVAREZ were then detained for further investigation by being placed in handcuffs without incident. The Dodge Ram was relocated to an ISP garage to allow a complete search of the vehicle. Officer Roa advised both DELORES-GUTIERREZ and SONOQUI-ALVAREZ of their *Miranda* rights in the Spanish language from an IMPD *Miranda* card. Both DELORES-GUTIERREZ and SONOQUI-ALVAREZ advised Officer Roa that they understood their *Miranda* rights as they were explained to them.

17. Trooper Smith asked DELORES-GUTIERREZ what type of controlled substances were located inside of the Dodge Ram, and DELORES-GUTIERREZ responded "heroin." One of the two bundles was then field tested, and the test packet showed the contents were positive for heroin. Trooper Smith then spoke with DELORES-GUTIERREZ about continuing to cooperate with a controlled delivery to their intended destination in Ohio, but DELORES-GUTIERREZ indicated he could not cooperate due to fears the he or his family might be killed by cartel members. Officer Roa then asked DELORES-GUTIERREZ what he wanted to do, and DELORES-GUTIERREZ requested an attorney and refused to answer any further questions.

18. Officer Roa and Trooper Smith then questioned SONOQUI-ALVAREZ about the heroin located inside of the Dodge Ram, and she responded that she did not know anything about the drugs that were found inside of the vehicle. Additional preliminary investigations by HSI, however, indicated that DELORES-GUTIERREZ and SONOQUI-ALVAREZ have held a joint bank account at JPMorgan Chase Bank NA that involved significant cash deposits and

withdrawals in excess of $119,000 between December 2015 and April 2016. They also had joint accounts at Wells Fargo and US Bank that demonstrated similar transactions. Based on the nature of their travel, their differing stories about their travel, and their joint account activities, your Affiant believes that SONOQUI-ALVAREZ was aware of and was participating in their drug-trafficking activities.

19. DELORES-GUTIERREZ and SONOQUI-ALVAREZ were subsequently arrested on state felony drug charges and were transported to the Arrestee Processing Center via the Marion County Sheriff's Office jail wagon.

20. The two suspected bundles of heroin, three cellular telephones, and $3,098.00 of United States Currency were seized by Trooper Smith as evidence. The suspected heroin had a total approximate field weight of three pounds (approximately 1,360 grams) when it was checked in to the ISP lab for forensic analysis.

**Conclusion**

21. Based upon the information contained in this Affidavit, your Affiant believes there is probable cause to charge Cristian DELORES-GUTIERREZ and Judith SONOQUI-ALVAREZ with having committing the crime of possession with the intent to distribute one (1) kilogram or more of a mixture or substance containing a detectable amount of heroin, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A).

Daron Babcock, Special Agent
U.S. Immigration and Customs Enforcement
Homeland Security Investigations

Sworn to and subscribed to me this 14th day of February, 2017.

Debra McVicker Lynch, Magistrate Judge
United States District Court
Southern District of Indiana